*H. CLAY KING *v.* STATE.

(*Jackson.*   July 7, 1892.)

1. CHANGE OF VENUE.  *Refusal of, not reviewable, when.*

Discretion of trial Judge refusing change of venue in a criminal case will not be reviewed on appeal except in a clear case of abuse. This is not a case for review of that discretion.  (*Post, p. 622.*)

Cases cited and approved: Porter *v.* State, 3 Lea, 496; Holcomb *v.* State, 8 Lea, 417; Poe *v.* State, 10 Lea, 673.

2. CONTINUANCE.  *Refusal of, for undue excitement not erroneous, when.*

Continuance of criminal case for "too great excitement, to the prejudice of defendant," rests in the sound discretion of the Court. Refusal of second continuance upon that ground and others, is not erroneous in this case.  (*Post, pp. 622, 623.*)

Code construed: ¾ 6038 (M. & V.).

3. JURY.  *Disqualifying opinion as ground for new trial.*

After verdict a strong presumption obtains, even in a criminal case, in favor of the competency of a juror who was selected and sat upon the trial; and a clear case must be proved against such juror to justify the granting of a new trial upon the ground that he had formed or expressed an opinion about the case before he was selected. (*Post, pp. 623, 624.*)

Case cited and approved: Mann *v.* State, 3 Head, 377.

4. SAME.  *Same.*

And the accused juror is a competent witness upon the trial of such issue.  His denial, supported by proof of his good character or by corroborating circumstances, may be sufficient to rebut the evidence of one or more attacking witnesses.  (*Post, pp. 623, 624.*)

Cases cited and approved: Rader *v.* State, 5 Lea, 610; Johnson *v.* State, 11 Lea, 47; Mann *v.* State, 3 Head, 373.

---

*King's sentence of death was commuted by Governor Buchanan to life imprisonment.—REPORTER.

5. SAME. *Separation of. General rules.*

Separation of jury *prima facie* vitiates their verdict. The separation may, however, be explained. The burden is upon the State to explain it. An explanation is sufficient that covers all that occurred during the separation, and shows clearly either that there was no communication with the jury during the separation or that such communication as was had was not of a prejudicial character. (*Post, pp. 624–627.*)

Cases cited and approved: Stone *v.* State, 4 Hum., 27; Hines *v.* State, 8 Hum., 601; Riley *v.* State, 9 Hum., 646; Rowe *v.* State, 11 Hum., 492.

6. SAME. *Same. Passing across State line.*

The passing of the jury across the State line is not, of itself, a separation, but, treating it as such, if the jury remained in strict charge of their officers, and had no communication with any one, their verdict is not thereby vitiated. (*Post, pp. 626–628.*)

7. SAME. *Same. Same.*

Although the jury and its officers may have passed outside the State and beyond the local jurisdiction, the Court has the power to punish them for misbehavior on their part occurring outside the State. (*Post, pp. 627, 628.*)

Case cited and approved: McCarthy *v.* State, 89 Tenn., 543.

8. SAME. *Exposure of jury to contact with and remarks by by-standers.*

The verdict of the jury is not vitiated—there being no misconduct on their part or on the part of their officers—by such unavoidable or necessary contact with by-standers as occurs ordinarily during trials, nor by any remarks made in their presence by by-standers. (*Post, pp. 628, 629.*)

Cases cited and approved: Brake *v.* State, 4 Bax., 361; Turner *v.* State, 89 Tenn., 548.

9. SAME. *Use of intoxicating liquors.*

Jury's use of intoxicating liquors does not vitiate their verdict when it appears there was no excessive indulgence. (*Post, pp. 629, 630.*)

Cases cited and approved: Stone *v.* State, 4 Hum., 26; Rowe *v.* State, 11 Hum., 491.

10. SAME. *Communication between jurors and outsiders.*

All communications, whether by letter or oral, between jurors and outsiders, without leave and supervision of the presiding Judge, are improper. The practice of allowing such communications upon permission of the officer alone is disapproved. The burden is upon the State to explain such communications. This explanation may be by direct evidence or by the circumstances attending the communication, or by both. All communications shown in this case are sufficiently explained. (*Post, pp. 631–638.*)

Cases cited and approved: Brake *v.* State, 4 Bax., 361; Luster *v.* State, 11 Hum., 169.

11. EVIDENCE. *Cross-examination of defendant in murder case.*

In a murder case, the defendant having testified in his own behalf to his own peaceable character, may be required to answer, on cross-examination, as to his former violent conduct and breaches of the peace toward persons other than the deceased. (*Post, p. 638.*)

12. SAME. *Same.*

So, likewise, the defendant, having volunteered to prove for himself an honorable military career and record, may be interrogated, on cross-examination, as to particular incidents in that career. (*Post, p. 638.*)

13. SAME. *Proof of motive and malice.*

King killed Poston. State's theory, assassination; King's theory, self-defense. King claimed that in a certain litigation between himself and Mrs. Pillow, Poston, as the latter's attorney, had in a certain pleading used language derogatory to the character of Mrs. King; that he, as a loyal and loving husband, sought Poston, and demanded retraction, and that an altercation ensued, in which he killed Poston in self-defense. King put portions of the record in the King-Pillow litigation in evidence. The State undertook to show that the reference in the pleadings to Mrs. King was not derogatory to her but to defendant; that King had abandoned his wife, and had long sought to divorce her, in order to marry Mrs. Pillow; that he had conveyed all his property to the latter, his suit being an effort to recover it; and that revenge and the desire to rid himself of a formidable adversary in the litigation, prompted him to kill Poston. The Court admitted in evidence the portions of the record not offered by defendant, the deeds made by King to Mrs. Pillow, and proof of the relations, social and otherwise, of King and Mrs. Pillow.

*Held:* This evidence was admissible for the purpose of showing motive, and to contradict defendant, and as part of a record the other portion of which defendant had introduced. (*Post, pp. 638–642.*)

H. Clay King *v.* State.

14. ARGUMENT OF COUNSEL. *Allusions by Attorney-general to other cases. Exception.*

Mere allusions by the Attorney-general, in his closing argument, to other cases tried in the same Court and affirmed upon appeal, by way of illustration, afford no ground for a new trial where no exception to the argument was taken at the time it was made. (*Post, pp. 642–644.*)

Cases cited and approved: Northington *v.* State, 14 Lea, 424; Staples *v.* State, 89 Tenn., 231; Swayne *v.* State (oral opinion), Jackson, 1890.

15. SAME. *Requests to charge concerning.*

It is not error for the Court to refuse to give requests touching alleged improper argument by the attorney-general, where they are so framed as to be a sweeping criticism of the argument, pointing out no specific objections to it, or where they are not justified by the record, or where good and bad propositions are indiscriminately intermingled. (*Post, pp. 644, 645.*)

16. NEW TRIAL. *Not granted for newly-discovered evidence, when.*

New trial will not be granted in a capital case on account of newly-discovered evidence in support of the plea of insanity, the evidence being merely cumulative, and no diligence to obtain it on the first trial being shown, and its character such that the result would not be thereby changed. (*Post, p. 645.*)

17. CHARGE OF COURT. *As to premeditation.*

The Court's charge as to premeditation is quoted and approved. (*Post, pp. 645, 646.*)

18. SAME. *As to insanity.*

The Court's general charge as to insanity is approved, though not quoted, as being in accord with the leading case of Stewart *v.* State, 1 Bax., 178. (*Post, pp. 646, 647.*)

19. INSANITY. *Burden of proof.*

Upon plea of insanity in criminal case, the defendant being presumed sane, the burden is upon him, in the first instance, to prove insanity. The proof of insanity may, however, occur in the State's evidence. That proof of insanity is sufficient which raises a reasonable doubt upon that point. (*Post, pp. 647, 648.*)

Cases cited and approved: Stewart *v.* State, 1 Bax., 178; Dove *v.* State, 3 Heis., 370.

H. Clay King *v.* State.

20. ARREST OF JUDGMENT.   *Must rest upon matter of record.*

Motion in arrest of judgment must be based upon matter of record, and not upon any matter *dehors* the record.   *A fortiori*, it cannot be maintained upon affidavits contradictory of the record.   (*Post, pp. 648–650.*)

Cases cited and approved: State *v.* Allison, 3 Yer., 428; State *v.* Rogers, 6 Bax., 563.

21. DYING DECLARATIONS.   *Written.*

When dying declaration, otherwise admissible, is reduced to writing, and signed by the declarant, that being the only declaration made, the writing is admissible in evidence.   (*Post, pp. 649, 650.*)

22. VERDICT.   *Approved upon the facts.*

The Court approves the jury's verdict based upon the State's theory of assassination.   (*Post, pp. 651–653.*)

---

FROM SHELBY.

---

Appeal from Criminal Court of Shelby County. J. J. DUBOSE, J.

C. B. MILLER, W. G. WEATHERFORD, JAMES M. GREER, LEE THORNTON, and T. W. & R. G. BROWN for H. Clay King.

Attorney-general PICKLE, GEO. B. PETERS, District Attorney-general; TURLEY & WRIGHT, and GANTT & PATTERSON for State.

LURTON, J.   This is an appeal from a conviction of murder in the first degree.   The transcript

consists of two thousand five hundred pages of printed matter. It will, therefore, be impossible, within the compass of a legal opinion, to present any thing like an analysis of this vast mass of evidence. All that we can hope to do is to state the errors which have been assigned by counsel, and briefly state our conclusion upon them.

*First.*—The application of the defendant for a change of venue was refused, and this is assigned as error. Such an application is addressed to the sound discretion of the trial Judge, and this discretion will not be reviewed, unless a strong case is made out, showing an abuse of that discretion. *Porter* v. *State*, 3 Lea, 476; *Holcomb* v. *State*, 8 Lea, 417; *Poe* v. *State*, 10 Lea, 673.

We have carefully examined the evidence heard by His Honor, bearing upon this application, and we are unable to discover any abuse of his power. This is made the more evident from the fact that a jury was obtained without the exhaustion of the peremptory challenges allowed the defendant, and without the exhibition of any popular excitement.

*Second.*—The second application for continuance was properly disallowed. The indictment was found during the January term, 1891, of the Court. After arraignment and plea, the case was set for trial for April 6, 1891—a day of the same term. At this date, an application for change of venue was overruled, and the case again set for April 13. At that date the case was continued, upon application of the defendant, to the next term,

upon the ground òf "undue excitement and prejudice," and for other causes; and, upon motion of the defendant, set for trial for the first Monday in June, 1891. On this date, the application for change of venue was renewed, and overruled, and then the defendant applied for a second continuance, upon the ground of the prejudice which he averred still existed against him in Shelby County.

Since the Act of 1875, § 6038 Code of Milliken and Vertrees, a continuance because of too great excitement rests in the sound discretion of the Court. The Court had, when this application for continuance was made, already granted one continuance, and we see no error in his refusal of a second.

*Third.*—It is next assigned as error that Juror Smith had, previous to the trial, formed and expressed an opinion adverse to the defendant. On the original examination of this juror, he admitted that he had read the newspaper accounts of the killing of Poston, and that he had talked about the case with several parties. He said, however, that he had formed no opinion, and that he could render a verdict upon the law and evidence presented.

"From the fact that the juror was selected, he must be presumed to be competent. To overthrow this, a clear case must be made out against him." *Mann* v. *State*, 3 Head, 377.

The witness, White, by whom it was sought to show that the juror had expressed an opinion ad-

verse to the defendant, shows himself to have been a partisan of the defendant. His memory as to the conversation with Smith was not clear. He had heard a large number of persons express opinions adverse to the defendant, and it is by no means clear that he had not confused, what was at best but a casual conversation with Smith, with what he had heard others say.

Smith denies that he had ever expressed such an opinion to Dr. White. He is shown to be a man of good character, and had no particular acquaintance with either the defendant or the deceased.

The witness, Hessin, also relied upon to show that Juror Smith had an opinion, was impeached by his contradictory statements made to Gaither and to W. K. Poston. Besides, he refused to *swear* that he had heard Smith express an opinion, saying he could only *state* his impression or belief.

That the juror is a competent witness, and that his denial, supported by proof of good character or by corroborating circumstances, is sufficient to rebut the evidence of an attacking witness, is established by our cases. *Rader* v. *State,* 5 Lea, 610; *Johnson* v. *State,* 11 Lea, 47; *Mann* v. *State,* 3 Head, 373.

*Fourth.*—Misconduct of jury. Under this general assignment a number of instances of alleged misconduct are relied upon as vitiating the verdict and requiring a new trial.

The well-settled rule in felony cases requires that the jury shall be kept together, and separate

and apart from other persons, and that there shall be no communication between them and persons not on the panel. That this rule may be enforced, the law requires that the jury shall be put under the charge of an officer sworn to keep them together and to prevent them from mingling with others, or having any communication with persons not of the jury, and to have none with them himself in regard to the case.

This procedure in high grades of crime has, from the earliest history of this State, been regarded as essential to the common law right of trial by jury guaranteed by our Constitution, and as a practice tending to prevent extraneous and improper influences from affecting the jury charged with the liberty or life of the citizen.

While there is no uniformity of decision in the Courts of England or America as to the legal effect of evidence of a separation without more, yet the weight of authority elsewhere, and the unbroken line of opinion in this State, is, that, *prima facie* the verdict is vitiated by the fact of separation. If, however, it is made to appear that the misconduct could not have been harmful to the defendant, then it is not ground for a new trial.

"It is the opportunity of tampering with a juror afforded by the separation," said Chief Justice Deaderick, "which constitutes the ground for a new trial; but if such separation afforded no such opportunity, there can be no excuse for a new trial." *Cartwright* v. *State*, 12 Lea, 625.

40—7 P

Where all that occurred during a separation is fully explained, and it can be clearly seen that there was no opportunity for improperly influencing the jury, or that the communication had with the jury was not calculated to improperly affect them, then to set aside a verdict otherwise sustained would be to sacrifice substance to form and bring the administration of law into just discredit. *Greenlow* v. *State*, 4 Hum., 27; *Hines* v. *State*, 8 Hum., 601; *Riley* v. *State*, 9 Hum., 646; *Rowe* v. *State*, 11 Hum., 492; *Cartwright* v. *State*, 12 Lea, 625.

Having in view these principles governing such trials, we will briefly examine the facts mainly relied on as showing a violation of the rule requiring the jury to be kept together and prohibiting communication:

1. That the jury, during the trial, went beyond the border of the State. The facts are these. This trial took place in midsummer, at Memphis, on the Mississippi River. It lasted thirty-three days. The health and comfort of the jury made it proper that the jury, during so protracted a trial, should, under proper supervision, be given opportunity for exercise. For this purpose, during the adjournments of the Court, they were several times taken for walks and rides in and about the city and suburbs. Upon one of these occasions, accompanied by two specially sworn officers, they were taken on board the ferry-boat which plies between the Tennessee and Arkansas sides of the river. When the boat

made its landing on the western or Arkansas shore,
the jury were permitted to walk up on the bank
of the river, where they stood for a few minutes,
or until the boat was ready to make its return
trip.  During the entire trip the jury were kept
together, and there was no mingling with other
persons, and no communication whatever between
jurors and other persons.  It is now insisted that,
while thus without the State, the jury, in legal
effect, were dispersed, and no longer under the
legal control or custody of the Court's officers;
that while beyond the State, the officers had no
right to control or restrain the jury, and the
Courts of this State no power to punish for any
act in disobedience of its rule or contempt of its
authority done beyond the border of the State.
If all this be admitted, yet it does not follow that
the verdict is necessarily vitiated.  It being affirm-
atively shown that, during the period covered by
this alleged dispersal, the jury did not, in fact,
separate, and that, in fact, they had no sort of
communication with outsiders, the case is taken
thereby without the rule, which vitiates the ver-
dict only where a separation is unexplained.  The
assumption that the Court would have had no au-
thority to punish an act in contempt of its author-
ity affecting its jury or its process is not supported.
In McCarthy's case, it was ruled that a Court of
this State might punish for contempt committed
in another State, by there attempting to induce a
witness to disobey the process of the Court which

had been executed upon him while within this State. 89 Tenn., 543. Whether the officers in charge of the jury could or could not lawfully restrain the jury while outside the State, is unimportant, in view of the fact that their authority was not brought in question, the jury remaining together and avoiding communications without requiring the exercise of force.

2. In going in and out of the crowded courthouse, and in passing upon the streets for air and exercise, or between the hotel, where boarded, and the court-house, there was necessarily some crowding and jostling of the jury. It is argued that this afforded opportunity for improper communications, and vitiated the verdict. Upon these occasions the jury were as carefully guarded as was possible, and there was no actual separation. No communication with the jury is shown, save in one instance, to be hereafter considered. It is not shown that any prejudicial observations were ever made to the jury when thus in necessary contact with others. Where the jury is guilty of no misconduct, but are involuntarily subjected to observations of by-standers, even though intended to prejudice the defendant, it will not raise any legal presumption against the verdict. It is the misconduct of the jury resulting in the opportunity for the exercise of improper influence, or in the reception of prejudicial communications, which justifies the inference of harmful results to the defendant. If the involuntary hearing of prejudicial

observations, whether in the jury-box or on the streets, should operate to raise a legal inference of undue influence, jury verdicts would be of little stability. *Brake v. State,* 4 Bax., 361, and *Turner v. State,* 89 Tenn., 548, are cases illustrating the non-application of the general rule, although very prejudicial communications were made to the jury by by-standers. The jury being guilty of no misconduct, the defendant was held not to have been affected. The presumption of right acting attends the jury so long as it is guilty of no misconduct. Here, without evidence of any effort to influence the jury by by-standers, we are asked to presume that, because while in the jury-box persons could pass near enough to them to have made observations, or while on the streets or in passing in and out of the court-room, or in public conveyances, that because it was possible for them, though under the guardianship of two vigilant officers, to have received communications, that therefore we are to presume that they were subjected to prejudicial influences. No such presumption arises, and the objection is frivolous.

3. There was evidence that the jury had been permitted to send for and drink intoxicating liquors, such as whisky, wine, and beer. There was no abuse of this privilege, and not the slightest evidence that any juror was in any degree rendered incompetent or less capable of an intelligent discharge of his duties by these indulgences. The old rules, which prevented juries from eating

or drinking, have long since been so far modified
as to require evidence of some excess to authorize
the setting aside of a verdict in consequence of
mere irregularities.  *Stone* v. *State*, 4 Hum., 26;
*Rowe* v. *State*, 11 Hum., 491.

4. The jury were carried into a store, that Juror
Mustin might order some supplies sent to his fam-
ily.   Some two or three persons were in the store,
among them one Rawlins, a neighbor of Mustin.
The juror inquired about his family.   The witness,
Rawlins, says he replied "that I saw his wife, and
they were all well a few days ago."   He then adds:
"I says, well, I reckon you are getting tired, very
tired, of this; and he says, 'Yes; I wish I could
go home.'   I just remarked, What do you think?
and he says, 'It will be a hung jury.'"   Mustin
was not separated from his fellows when this oc-
curred.   A part of the jury, under one officer,
were about the middle of the store, it being some
seventy feet deep, the rest, including Mustin, under
another officer, went to the rear of the store to
the water-bucket.   As these were moving toward
their fellows in the front, the witness, Rawlins,
who was sitting by the counter, was passed by the
jurors, and the conversation detailed had.   It was
very reprehensible in the witness and in the juror,
but it is thoroughly explained.   There was no at-
tempt to influence the juror, and any presumption
arising from an attempt by a stranger to commu-
nicate with a juror is rebutted by the undisputed
evidence of the very witness relied upon to estab-

lish the communication, which shows that nothing prejudicial to the defendant was said.

5. There is evidence that Juror Mustin wrote and mailed a letter while on the jury. But it is shown that it was written to his wife, examined by the officer in charge of the jury, and that it contained nothing in any way affecting the defendant. This matter may be, therefore, dismissed from further consideration.

6. It also appears that the same juror received a letter from his wife. The contents of this do not fully appear. It does, however, appear that the letter was opened and read by the officer with the jury, and by him permitted to go to the juror. It is argued that this is an unexplained communication, and, as such, vitiates the verdict.

There is a very close connection between the rule concerning separation and that affecting communications. A separation is only prejudicial when it leads to improper communications; and that it did so, will be presumed where opportunity for such communication was thereby afforded. Communications, whether to a single juror, separated from his comrades, or to the whole jury, are equally prohibited, and a presumption of prejudice arises when the mere fact of communications is shown without explanation. This inference of harm may be overturned by the circumstances under which it was had, if, from them, it clearly appears that the jury were guilty of no misconduct; as, where by-standers make observations, which are

unwillingly heard by the jury, who, otherwise, are in discharge of their duty. *Brake* v. *State*, *Turner* v. *State*, *supra.* So, if the facts concerning the communication clearly tend to show its harmless character, a new trial will not be granted, even though the juror was guilty of misconduct in engaging in a violation of his duty. *Riley* v. *State*, *supra*, is a case illustrating this. That was a capital case. Two jurors were shown to have conversed with persons not on the panel. These conversations were explained. This Court said:

"A separation of the jury, or a conversation unexplained, we have held a good cause for a new trial, because, in such case, we cannot know that the juror thus separating himself, or thus conversing, was not tampered with. But, on the other hand, it is the settled law of this Court that such separation or conversation may be explained; and, although the juror may and ought to be punished, yet, when it is satisfactorily shown that he was not tampered with, and that no influence unfavorable to the prisoner could by possibility have existed, it is no cause for new trial." To same effect is *Luster* v. *State*, 11 Hum., 169.

The *conscious misconduct of the juror* in holding the communication, furnishes the basis for the inference that he has been tampered with. Where this element is missing, the presumption does not and should not arise, but the effect of the communication upon the verdict should be made to depend upon the circumstances.

The rule, as deduced from the cases by Thompson & Merriam, in their very valuable work on juries, seems to us sound. It is this:

"Whether a communication, then, will afford ground for new trial must depend upon its harmful tendency; and this is to be determined according to the circumstances of each case, having reference to the nature of the communication, the person making it, the time when, the place where it was made, and other surroundings." Sec. 348.

Testing this assignment of error by this common sense rule, is it so far explained as to leave no doubt upon the mind of a Court that the juror was not improperly influenced by the communication?

(*a*) It was a letter from the wife of the juror. If it had been from some one interested in the prosecution, or if it had been from some one unknown, the inference arising would be greatly strengthened.

(*b*) It was opened and read by the officer charged with the custody of the jury, and permitted by him to go to the juror. This is not to be approved. The officer is not the judge of what should be communicated to a juror. But the record shows, without contradiction, that the officer understood that the jurors might, with his knowledge, communicate with their families, and that such had always been the practice in that Court. He furthermore shows that this practice was known to the attorneys of the defendant, and that

at least one of them knew that during this long and tedious trial the jurors were in the habit of communicating, in the hearing of the officer, with their families. No objection is shown to have been made by counsel to the practice, but it is now sought to fasten upon the instance now under consideration, and secure a new trial, upon the ground that such communication was unlawful and is not sufficiently explained. We do not wish to be understood as approving the practice shown to exist in the trial Court. But the fact that it has long been understood to be permissible, removes the imputation that the officer or juror were conscious of misconduct in this matter, and in part explains the failure of learned counsel for the State to examine the witness as to the purport of the letter received by the juror.

(c) The evidence as to this letter was brought out by the defendant himself—on cross-examination, it is true; but it was original proof. The juror receiving the letter could have been asked to state the contents of the letter, or to have filed it. He was not. The defendant dropped the subject with the proof that the officer, after opening and reading the letter, permitted him to see it. It is not as if the fact were shown by a witness who knew no more than the fact of the receipt of the letter. The witness knew the purport; the officer knew it; and he, too, was dropped with the mere statement that he carefully examined every letter and note received by the

jurors. Under all these facts and circumstances, it seems to us that the nature of this communication is clearly shown to have been domestic and harmless; and that, to grant a new trial under these circumstances, upon the assumption that the wife of a sworn and impartial juror has been guilty of tampering with her husband in the interest of the State, would be to extend the rule on this subject beyond the reported cases, and sacrifice the substance to the husk of a technicality.

7. A similar assignment is relied on concerning a communication with Juror Smith. The defendant, as original matter, elicited from this juror, when examined in open Court on motion for new trial, the fact that, when on the jury, he had met his wife and son—a boy of fourteen—in the dining-room of the hotel where the jury were boarded, and there had a conversation with them. The subject was dropped by defendant with the bare proof of this fact, although, as in the instance just passed upon, the evidence was made by himself, and when, if he had entertained any suspicion that he had been, in any degree, prejudiced, he could, by the same witness, have shown its full purport. The facts tending to explain this communication, and indicating its harmlessness, as appearing in other parts of the record, are these:

(*a*) That Officer Perkins was the responsible officer in charge of this jury. He was assisted by two others; but either Perkins or Officer Harrell were always with the jury, and generally both.

(b) Officer Harrell shows that when he was with the jury no communication whatever occurred between it and persons not of the panel.

(c) The jury were never separated, and the communication between Juror Smith and his family necessarily occurred when with the jury, and while Officer Perkins or Harrell had charge of it.

(d) Officer Perkins shows that it was the practice in the Criminal Court of Shelby County, in the hearing and presence of the officer in control of the jury, and without special leave of the Court, to permit jurors to speak to members of their family, and to send messages to them by friends. He shows that this practice was known to counsel practicing in that Court, and that at least one of the leading counsel for defendant knew that the practice was being indulged during this trial.

(e) No objection is shown to have been made, during the trial, to this very reprehensible practice; nor does it anywhere appear that the learned Criminal Judge knew of it; nor that his attention was ever called to it by counsel for defendant, who appear to have been fully aware of it.

(f) The fact as to this practice, and the knowledge of defendant's attorney as to its continuance in this case, were drawn from the officer by the defendant, and was original evidence. Defendant also asked the officer this question:

"*Ques.* Can you say that none spoke to them a single word you didn't hear?

"*Ans.* Yes, sir; I will most emphatically."

From this it clearly appears that all these communications between jurors and their families, whether at the hotel or in the court-house, were heard by the officer. The officer was not asked about particular communications, the defendant contenting himself with this general statement, which clearly covers the particular communication under consideration, as well as all others.

(*g*) The details of the several communications were not asked for by defendant, though the evidence, as before stated, was original evidence introduced by himself.

(*h*) The general character and purport of all of them is, however, shown by the officer as part of the defendant's examination, who, as part of his statement concerning his habit to allow these conversations, described the practice thus:

"When a juror would see one of his friends in the court-room, he would call me, and say: 'I want to speak to so and so, to send some message home.' We would let that relative come around so the juror could send some message home."

From all these facts, and under all the circumstances of this case, looking to the persons with whom the juror conversed, the fact that it was in the presence and hearing of his fellows, and with the permission of the officer and in his hearing, the entire absence of any conscious misconduct upon the part of either juror or officer; and in view of the fact that the defendant himself drew

out the evidence as to the fact of the conversation, and dropped the subject without any effort to show its purport, we are entirely convinced that this communication is sufficiently explained, and that no possible prejudice could have resulted to defendant thereby.

*Fifth.*—Error in admission of evidence.

1. That evidence was admitted as to former violent conduct of defendant, and breaches of the peace toward persons other than deceased. There is nothing in this objection. The defendant was examined as a witness, and voluntarily testified to his own peaceable character, and that he had never, since 1859, been engaged in personal combat. The evidence now objected to was a cross-examination of the defendant as to this evidence in chief. No objection was interposed at the time, and, of course, none can now be heard. The defendant likewise went into his career as an officer in the service of the Confederacy. He was cross-examined as to some facts in this connection. It was a legitimate cross-examination of the defendant as to matters upon which he had been examined in chief.

2. We come now to consider some very sweeping objections to the admissibility of evidence which it has been urgently argued was incompetent and highly prejudicial. These objections may be grouped as follows:

(*a*) Evidence as to certain conveyances made by the defendant to a Mrs. Pillow.

(*b*) Evidence concerning the relations, social and otherwise, existing between Mrs. Pillow and defendant.

(*c*) Evidence from and concerning certain acrimonious litigations pending between Mrs. Pillow and defendant, and springing out of the peculiar relations they had borne to each other, and the conveyances made to her in consequence of that relation.

In these litigations the deceased, David Poston, who was a lawyer of great eminence and high character, represented Mrs. Pillow as leading counsel. The defendant, King, was, likewise, a lawyer at the same bar, and a legal author of repute and learning. In these suits, involving the entire estate of the defendant, though aided by others, he, in the main, represented himself. The suits were instituted by defendant, who thereby undertook to cancel the deeds executed to Mrs. Pillow, and recover the property thereby conveyed. There was much conflict as to what had been the circumstances and consideration leading to the deeds.

The defendant, as a witness for himself, originally introduced very much of the evidence concerning his relation to and suits with Mrs. Pillow, and his counsel, in argument and brief, have failed to discriminate between that put in by the defendant and that introduced by the State over objection. The criticism of the Court's action concerning this alleged prejudicial evidence has been so indiscriminate and sweeping as to embrace both classes

of proof. The theory of the defense was on the trial, and still is, that certain statements appeared in an answer in equity, filed by Mrs. Pillow, which seriously reflected upon the character and honor of Mrs. King, the wife of defendant, and that the deceased was responsible for these statements to the husband of the insulted wife. The defendant, by his own evidence, sought to place himself in the attitude of a loyal and loving husband, championing the fame and honor of a devoted wife— as to whom, this record contains not one word to her discredit. To support this honorable motive, he introduced the pleading containing the particular matter complained of, and such other parts of the records in those suits as he regarded necessary. As a witness, he stated his construction of the paragraph alluding to his wife, giving it a meaning absolutely without foundation, and calculated to arouse the stormiest passions which could agitate a manly bosom. He undertook, in advance of assault, to explain his relations to Mrs. Pillow, and the circumstances and consideration moving him to make wills and deeds in her favor, by which he stripped himself of his entire estate. For this purpose, he went fully into the history of his acquaintance with her, and analyzed the character of his affection and attachment, giving his own color, to conduct which, he admits, had occasioned gossip and scandal, and which, seemingly, presented him as the protector and champion of one other than the woman he had vowed at the altar to honor and cherish.

The State, upon his cross-examination, undertook to meet this theory, and contradict his testimony by the introduction of other parts of the records in the pending suits, and by his own depositions filed therein. It sought to show that the defendant had long cherished the wish to obtain a divorce from his wife, and had agreed to marry Mrs. Pillow when this should be granted. It sought to show that the objectionable pleading had been filed some eighteen months before the assault on deceased, and that nothing contained in it could have properly excited the resentment of defendant.

The defendant had stated the effect of this pleading to have been the destruction of the happiness of himself and wife. "That his old acquaintances on the street avoided him." "The door-bell ceased to ring." The State sought to show that his real motive was revenge. Poston had espoused the cause of Mrs. Pillow, and endeavored to show that the deeds to her rested upon a moneyed consideration. The defendant, to over-throw this, alleged an agreement to marry when he could obtain a divorce. The pleadings were sensational. They naturally found their way to the public press. The result was public disgrace, as well as the possible loss of his entire estate. These considerations the State undertook to show led to such feelings of malice and resentment as resulted in the killing of the lawyer who had stood across his path and subjected him to public disdain and opprobrium. Much of the evidence

41—7 P

offered by the State on these topics was clearly admissible for the purpose of contradicting the defendant; much was admissible upon the ground that the State was entitled to such other parts of a record introduced by an adversary as relate to the same subject. Still more of the evidence objected to was admissible as independent proof tending to show the motive of the defendant, or contradict that asserted by himself as a witness. We have carefully examined all exceptions reserved to evidence by the defendant, and are clearly of opinion that no reversible error is presented by any one of them.

*Sixth.*—It is next assigned as error that a new trial was not granted, because of alleged intemperate and improper argument by the District Attorney in closing the case. This argument, as taken down by the short-hand reporter, is made part of the bill of exceptions. We have carefully examined it. It does not contain any statement of evidence relating to or affecting this defendant for which there is not some authority in the record. The objections principally urged against parts of it apply rather to the references made by the State's officer to the facts of certain other causes tried in that Court, and resulting in convictions affirmed by this Court. Mere allusions to other causes as illustrations of argument, has been held by this Court, in one of its best considered cases, to be insufficient ground for a new trial. *Northington* v. *State,* 14 Lea, 424.

No objection was made, or exception reserved, to any part of the argument now complained of. The trial Judge ought not to be put in error for failing to check or reprove mere intemperate argument, or historical reference to the facts and results in other causes unless objection be taken at the time and a ruling requested. This case is distinguished from *Staples* v. *State*, 89 Tenn., 231, and *Swayne* v. *State*, MS., Jackson, 1890, in that the language complained of was unexcepted to at the time.

Counsel for the defendant, after the argument of the case had been completed, requested the following instructions relative to certain remarks of the Attorney-general, made in his closing speech to the jury, viz. :

"1. It is the duty of the jury to decide the case solely on the law as given you by the Court and the evidence as given you by the witnesses. Counsel for the prosecution and defense are permitted to address you in favor of their respective sides, but denunciation of the defendant or witnesses in language of bitterness or passion should not be regarded by you, nor influence your verdict. Nor should you regard that part of the Attorney-general's speech, when addressing you, in which he told you that the wife of the defendant was made to apologize to Mrs. Pillow, because there was no evidence of such apology; nor that part in which he tells you of the Parker Harris case, and the Brenish case, as it is for you to decide this case

on the evidence in it alone, and not upon what other juries may have done in other cases, the facts of which are not reported in the books and not in evidence before you.

" 2. At the further request of defendant, I further instruct you that you should not regard the Attorney-general's statement, in argument, that, at the time of the homicide, ' defendant was behind the post, if the truth was known,' as there is no evidence to show that defendant was so concealed. Nor should you regard the fact, stated by the Attorney-general in argument, that ' the defendant told the newspaper reporters, after the homicide, that he had no statement to make,' because the Court excluded this evidence, and it is not, therefore, before you for consideration at all."

There was no error in refusing these requests as they were framed. The first was clearly objectionable, because not specific in its reference to the language of " bitterness and passion." It pointed out nothing, and was intended as a sweeping criticism of an argument not objected to when made, and sought to be weakened by a general observation. The jury had been fully instructed that they must try the case upon the sworn testimony alone, and without bias or prejudice. If any further instructions were proper to insure such a consideration of the case, the instructions should have been so framed as to point out the particular evil to be guarded against. The instruction was objectionable upon another ground. It embraced a state-

ment to the jury that there was no evidence to support a particular argument made by the Attorney-general, when the record shows that there was evidence tending to justify the contention of that officer. The Court cannot be put in error for refusing a request which embraces both proper and improper matter. The second request was properly refused. There was evidence tending to support the argument sought to be eliminated.

*Seventh.*—The motion for a new trial, based upon newly-discovered evidence tending to support the defense of insanity, was properly overruled. The evidence was cumulative, and no sufficient diligence is shown in the effort to get the testimony for which a new trial was asked. Besides, it seems to us, upon a careful consideration of the whole evidence, that a new trial for the purpose of submitting the evidence newly discovered could be of no possible advantage. That in the record, added to that discovered, it seems to us, could not together engender a doubt of the legal responsibility of the defendant, judging him by his own evidence as a witness concerning his conduct and actions on the day and at the moment of the killing of deceased.

*Eighth.*—The charge is full, and free from any error of which defendant can complain. Detached sentences have been pointed out as erroneous. These sentences, where taken in connection with their context, are unobjectionable. Some criticism has been urged against a clause wherein the Court

told the jury that the premeditation · necessary to constitute murder in the first degree "draws with it the necessity of express malice toward the victim on the part of the assailant;" because, said His Honor, "it would be impossible, in the nature of things, for premeditation to exist toward an individual without, at the same time, having toward that individual the express evil intent constituting express malice." This is substantially repeated where the Court said: "If you are satisfied from the proof that defendant premeditated the death of the deceased, David H. Poston, this ingredient of murder in the first degree would naturally draw with it the necessity of express malice towards the deceased on the part of the defendant. This is evidenced," adds the Court, "should it appear that the defendant, with a sedate and deliberate mind and formed design towards the deceased, killed him; which formed design may be inferred from external circumstances disclosing the inward intention—such as lying in wait, antecedent thoughts, former grudges, and concerted schemes to do the deceased some bodily harm."

The Court had previously instructed fully as to the necessity of deliberation and malice. He had defined premeditation. He was considering murder in the first degree alone in this part of his charge. Subsequently he told the jury of the effect in reducing the degree of crime, which would result from the presence of provocation or passion. The suggestion that a man in self-defense may pre-

meditate the killing of his adversary, and that, therefore, malice is not presumed or inferred from premeditation, is fully met when the Court came to charge upon the subject of self-defense. The charge on the subject of insanity is in accord with *Stewart* v. *State*, 1 Bax., 178.

On the burden of proof concerning insanity the Court said: "The material question for your consideration is, Was the act of killing, as charged in this case, the deliberate act of a sane man? The law presumes that every man is sane until the contrary is proved, and when insanity is set up as a defense to any criminal charge, the burden of proof is upon the party alleging it. The Court, however, charges you that if from all the proof in the case you have a reasonable doubt as to whether the defendant was sane at the time he committed the act charged, he is entitled to the benefit of the doubt, and in that event your verdict will be not guilty."

In the leading case of *Dove* v. *State*, this Court said: "It may be safely stated that no person can be guilty of murder who has not sufficient discretion or discernment to distinguish between good and evil, and who has no consciousness of doing wrong. The law presumes every person to have this sound memory and discretion. Therefore, when the defendant was put upon his trial for murder, it was not necessary for the State to adduce proof of his sanity. The presumption of law stood for and supplied the proof. If he relied

on the defense of insanity, the burden of proof was upon him to show that he was not of sound memory and discretion, unless the proof of the State showed that he was not of sound memory and discretion."

Again the Court said: "But suppose the proof in the cause makes. an uneven balance in the minds of the jury whether the defendant was sane or insane; how, in that state of doubt, could the jury find that the defendant did the killing willfully, deliberately, maliciously, and premeditatedly? They are in doubt about his being of sound memory and discretion. * * * The presumption of sanity stands for sufficient proof of sanity until the presumption is overturned. When the proof of insanity makes an *equipoise,* the presumption of sanity is neutralized; it is overturned; it ceases to weigh, and the jury are in reasonable doubt." 3 Heis., 370, 371.

The charge was fully as favorable as the defendant was entitled to. Upon the general subject of insanity, the charge, as we have elsewhere stated, was in accord with our decisions, and there was no error in refusing the additional charge asked for.

*Ninth.*—A motion in arrest of judgment was entered and overruled. The motion was in these words: "Comes the defendant and moves the Court in arrest of judgment on the verdict of conviction rendered against him on July 3, 1891; and for grounds of motion states that, on Thurs-

day, July 2, 1891, the afternoon, the Sheriff of
the county announced in open Court that the
Criminal Court of Shelby County was adjourned
until Monday, July 6, 1891, at half-past eight o'clock
in the morning of said day. The Court was not,
thereupon, lawfully in session on Friday, July 3,
1891, at the time the verdict was rendered and
received against defendant."

The minutes of the Court did not support this
motion. By the record, it appeared that the ad-
journment on the second of July was to the third
of July, and the same record showed the Court in
session on the third, pursuant to the adjournment,
and the return of the jury into Court on that day
with the verdict. A motion in arrest of judgment
must be rested upon that which appears of record,
and evidence *aliunde* is not admissible upon such
a motion. *State* v. *Allison*, 3 Yer., 428; *State* v.
*Rogers*, 6 Bax., 563.

The motion was therefore properly overruled.
But if it be considered as a motion to correct the
record, supported by affidavit that the Sheriff did
announce an adjournment to July 6, then it is
equally unavailing. The announcement by the Sheriff
did not conclude the Court from having the minutes
show an adjournment to a different time. Whether
the Sheriff made a mistake or the Judge retracted
the order is equally unimportant. The record, as
made up by the Judge, and as signed by him, is
conclusive of the fact that the adjournment was
to July 3, and the record of that day shows the

Court in session, and this, as well as other business, to have been transacted.

*Tenth.*—There was no error in the admission of the dying declaration made by the deceased. The evidence clearly shows that it was made in the belief that death was certain and impending. It was reduced to writing at his dictation, and signed by the declarant. The writing contained the only declaration made, and it was properly admitted as the best evidence of what his declarations had been. It was in these words: "I was walking down Main Street, just in front of Byrd's old stand. I saw H. Clay King approaching me, I thought with intention of speaking to me. He walked up in front of me, and told me I was a d—d s—n of a b—h. He pulled a pistol and fired, pushing it right at my body. No conversation had occurred between us at all. I made no effort to resent what he said; he shot me in an instant."

The defendant, after stating that he met deceased accidentally, and that, in standing on the side of the street in front of a cigar-store, he had no desire or expectation of meeting deceased, said, when examined as a witness for himself: "Mr. Poston came along. When Mr. Poston got opposite me, he looked at me and I looked at him, and I asked Mr. Poston to withdraw the charges that he had made against my wife and myself in a cross-bill in a suit in Arkansas—*King* v. *Pillow.* Mr. Poston said he wouldn't do it. I then said, 'Mr. Poston, you are a scoundrel.' Mr. Poston there-

upon denounced me. He says, 'You are a liar, a scoundrel, and a s—n of a b—h.' That was in front of Lee's store. I backed down in front of that alley, and I told Mr. Poston to stand back. His hands were in his overcoat, or coat, or whatever it was. I then drew my pistol and gave him one shot, and he retreated. I could have given him five more, but I only gave him one to repel the assault. That is what occurred.

"*Ques.* What you did was in response to the demonstration that he made with his hands, either under his overcoat or back against his hip?

"*Ans.* I don't know whether his hand was under his hip. It was under his overcoat. I couldn't tell whether it went back or into his pocket. It went under his overcoat.

"*Ques.* From his manner and demonstration, what did you understand was his purpose?

"*Ans.* Why, he was advancing upon me. Of course, I supposed that he was armed either with a knife or a pistol or some other weapon; but he was advancing, and I told him to stand back. I was in the alley. It was done quickly. He came up within three feet of me. I had backed into the mouth of the alley."

The conflict between defendant's testimony in his own behalf, and the dying declarations of the deceased was irreconcilable. The Court gave defendant a charge more favorable than he could rightly have demanded, in telling the jury that if they believed the facts to be as stated by defend-

ant that they should acquit him. The by-standers who saw and heard what passed, were examined. The overwhelming weight of their evidence was that no colloquy whatever occurred, and that the deceased made no such demonstration as described by defendant.

The fact that a grudge existed between the parties, and that defendant bore great ill will to deceased, is not disputed. The weight of the evidence strongly shows that defendant did not meet deceased accidentally; but that he had been looking for him, and had crossed the street to intercept him when he observed his approach. He was observed by several witnesses, just before the approach of Mr. Poston, to be standing in the attitude of one watching. He had on an overcoat with a side-pocket. In this he had his right-hand, grasping the partly-disclosed handle of an improved, self-cocking revolver of heavy caliber. The weight of evidence clearly shows a deliberate and premeditated purpose to kill deceased on sight. The verdict is well supported. The defendant was entitled to a full, patient, and impartial trial. This he has had by a jury of his own selection. Upon his appeal the record has been laboriously reexamined. No doubt exists as to the righteousness and justice of the judgment from which he has appealed.

The defendant stands condemned by that law at whose altar he has so long stood as a ministering priest. The decrees of that law, to be respected,

H. Clay King *v.* State.

must be impartial, for all are within its compass; " the very least as feeling its care, and the very greatest as not exempted from its power."

### DISSENTING OPINION.

SNODGRASS, J. I cannot concur in the conclusion reached on the question of communications with the jury. I understand the rule to be, that where a communication is shown to have been made to a juryman, it devolves upon the State the *onus* of showing clearly that it was not prejudicial to defendant. The law does not undertake to determine how injurious influences may be transmitted from without, or assume that it may not be done through relatives and families of jurymen. It forbids them all, and when it appears that a communication of any kind has been allowed, the establishment of the fact makes it unlawful, however innocent. Whatever may be its nature, it is not merely presumed to be, it *is* unlawful; but if in fact it is explained as innocent in its nature, and not prejudicial to defendant, the reception of such communication is not reversible error. Here written and oral communications of families and relatives are proven. In explanation, it is not only not proven what certain of these communications were, but it is not even said by the officers who had charge

of the jury, in their testimony on this point, taken on the motion for a new trial, that they were not about this case; nor even the opinion expressed that they were not prejudicial to defendant.

The view that this is technical is true. It is technical in one sense, that a jury must be kept separate and apart from others, and not be communicated with, and in another it is technical that defendant is entitled to a trial at all; but the communications which are forbidden, when unexplained, can never be other than material, unless we change the rule, and presume them all lawful and harmless until the contrary appears.

Like all other rules of law, it must have a statement in terms. This is its formula and expression; if it be the "husk of a technicality," as indicated by the majority, it is only unfortunate in present characterization. The rule remains sound, however, as an essential requisite to secure the most inestimable right of the citizen—that of a fair trial.

Entertaining this view, I think a new trial should be granted.