## Edmonds v. Commonwealth.

(Decided September 26, 1924.)

### Appeal from Bell Circuit Court.

1. Criminal Law—Court Need Not Instruct Specifically on Question of Alibi.—Court need not instruct specifically on question of alibi.
2. Homicide—Guilt of Defendant Held for Jury.—Guilt of murder held for jury, though there was evidence defendant was not at place of killing.
3. Criminal Law—No Complaint can be Made of Evidence to which no Objection was Made.—No complaint can be made on appeal as to evidence, where no objection was made to it at time it was offered.
4. Witnesses—Competent for Commonwealth to Prove Defendant had been Convicted of Felony.—It was competent for Commonwealth to prove that appellant had been convicted of felony, and defendant could not complain where he testified as witness that he had been in penitentiary.
5. Criminal Law—Statement Made in Presence of Accused as to Threat by Him Held Admissible.—In homicide case, deceased's wife was properly allowed to testify that her daughter, on day before killing, had in presence of accused and deceased said, "V. (defendant) said, if Pappy didn't drink it, he was going to shoot him."
6. Homicide—Presumption is that Dying Statement Signed by Deceased had been Read Over to Him.—It will be presumed that dying statement signed by deceased had been read over to him or that he knew its contents.
7. Witnesses—Contradiction of Witness Not Permitted Without Grounds Having Been Laid.—Court properly sustained Commonwealth's objection, when witness for defendant undertook to contradict witness for Commonwealth, without grounds for contradiction having been laid.
8. Criminal Law—Court Properly Sustained Objection to Mere Conclusion of Witness.—Court properly sustained objection to answer which was mere conclusion of witness.
9. Criminal Law—Court Instructing in Defendant's Absence, his Counsel Could Waive Reinstruction in His Presence.—Where during recess accused was remanded to jail, and after recess court read instructions and attorneys began argument before it was discovered accused was not in court, and he was then brought into court, ac-

cused's counsel could then in accused's presence waive reinstruction to jury; no constitutional right being thereby waived.

10. Homicide—Evidence Held to Warrant Conviction of Murder.—Evidence held sufficient to sustain conviction of murder.

W. J. STONE for appellant.

FRANK E. DAUGHERTY, Attorney General, and MOORMAN DITTO, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Affirming.

The appellant was convicted of the murder of Hiram Honeycutt, and his punishment fixed at imprisonment in the penitentiary for life.

The deceased, Hiram Honeycutt, his wife, Kate Honeycutt, and two little children lived in a small house in Slagtown, a suburb of Middlesboro. Mrs. Honeycutt was twenty-nine years of age. The deceased was probably twenty years her senior; he was nearsighted and at times was almost blind. On the night he was murdered, he and his wife and these two small children were sleeping in a bed in this little home. How the murderer entered the house is not known. This bed room had been dimly lighted by an improvised lamp made of a pickle bottle. The first of this sleeping family to be awakened was Mrs. Kate Honeycutt, who was aroused from her sleep by some man's taking hold of her hand and feeling of her person. She testified that she screamed and cried: "Lord have mercy, Hiram, honey, somebody is in the house." The intruder had extinguished this lamp, but had a flashlight by which he lighted up the room. His face was blackened, but his hands were not. Both Mrs. Honeycutt and her husband recognized the appellant as the intruder. Mrs. Honeycutt jumped out of bed and grabbed an ax, while Hiram Honeycutt undertook to get out of bed, but before he could do this, the intruder had taken the ax from Mrs. Honeycutt, and begun shooting Mr. Honeycutt, inflicting upon him wounds of such severity that he died therefrom about three o'clock the following afternoon. The appellant shot him four times and the four-year-old daughter was shot once, from which she recovered. Several people heard the shooting and went to the home of the deceased, while others, including some policemen and a doctor, were summoned there. When they arrived at the Honeycutt home, both Mr. and

Mrs. Honeycutt informed the officers that appellant had done the shooting. They described him as wearing a light gray coat, light tan shoes and a cap, with his face blackened. This shooting occurred about two o'clock in the morning of February 9, and after making some search around town, the officers went to the home of appellant's mother, in a little village called Columbia, a suburb of Middlesboro, and there, about five o'clock in the morning, they found appellant in bed, his face was blackened, and according to the officers, he appeared to be under the influence of liquor, and to have been out that night. It was discovered at the home of appellant's mother that some one had climbed in the window that night, but his brother-in-law, Jake Proffitt, explains this by stating that he had climbed in the window to avoid waking the other members of the family when he returned from work shortly after midnight. He further testified that he was absolutely sure that appellant did not leave that house after that time. His mother and sister testify to the same thing, and appellant argues that as this shooting took place about two o'clock, he could not possibly have done it; but he admits that on Friday, the 8th, between ten and eleven o'clock in the morning, he visited Mr. and Mrs. Honeycutt and that at that time he had on the same clothing which they described the man as wearing at the time of the shooting, and which clothing was afterwards discovered at the home of appellant's mother, and upon which was found what appeared to be blood stains. Mrs. Honeycutt told officers Crabtree and White that appellant was the man who did the shooting, when they came to her home a few minutes after the shooting occurred and Hiram Honeycutt told officer White the same thing.

Appellant insists that the court failed to give to the jury the whole law of the case, and insists that the court should have instructed specifically upon the question of the *alibi* he had offered. This position is not well taken, for in the case of Wallace v. Com., 187 Ky. 775, this court said:

"The contention that the court refused to properly instruct the jury is based upon the fact that in addition to denial of participation in the crime, the appellant testified and, also, produced other testimony to the effect, that the night upon which the crime was committed he spent at the dwelling of his

brother in the state of Missouri, and hence could not have been at Bardwell at that time, and it is now insisted for him that the court should have instructed the jury, touching this claim of an *alibi* on the part of appellant. This evidence offered by appellant, as to his being elsewhere, when the crime was committed was competent upon the issue as to his guilt, and the instruction of the court that before finding him to be guilty the jury must believe beyond a reasonable doubt that he broke and entered the store with the intent to steal, and to find him not guilty, if entertaining a reasonable doubt as to his guilt, were all the instructions necessary to protect his rights upon the issue as to his guilt."

He insists that the court should at the conclusion of the Commonwealth's evidence, have instructed the jury to acquit him, but we cannot agree with him, for it seems to us that the evidence of his guilt is overwhelming.

Appellant says the court admitted incompetent and irrelevant evidence offered by the Commonwealth, to which he objected and excepted. This evidence of which he is complaining is the evidence of the witnesses Esco Smith, Charles Carroll, Theodore Goodman, James Lawless, Frank White, Frank Crabtree, Jess Hatton and Kate Honeycutt, who were allowed to state what Hiram Honeycutt had told them about the shooting within a few minutes after the crime was committed; but no objection was made to this evidence at the time it was offered, none appears in the record, and the appellant cannot complain of it, even though the evidence were objectionable. He further complains of the evidence of the witnesses D. L. Manis, John Dixon and Charles Tawson. Upon an examination of the record, we find that but one of these witnesses was introduced, and that was D. L. Manis. It is true that Manis did testify that the appellant was a bootlegger, but the appellant objected and the court sustained his objection. Manis further testified that the appellant had told him he had started to meet a man down back of the old fair grounds, who was up there with a gallon of whiskey for him, but the appellant did not object to this. Manis also testified that the appellant explained his absence from the community by saying he had put up two years in the penitentiary; but there was no objection to that evidence, and no motion to exclude it.

The witness started to explain for what appellant had put up this service, when appellant objected and the court sustained the objection. It was competent for the Commonwealth to prove that the appellant had been convicted of a felony, and he certainly cannot complain of this, because he himself, in his direct testimony, testified that he had been in the penitentiary for 19 months and 10 days, and that he got back on Nov. 9, 1923.

Appellant also objects because the witness, Kate Honeycutt, was allowed to testify that her daughter, on the day before, had, in the presence of the appellant and the deceased, said to the witness, Kate Honeycutt: "Verne said if Pappy didn't drink it he was going to shoot him." We are unable to see why appellant objects to this, as it was said in his presence.

On the trial of this case the Commonwealth produced and was permitted to read to the jury the following paper:

"State of Kentucky, County of Bell.

"The affiant, Hiram Honeycutt, being first duly sworn, states as follows: I believe that I have no chance to live very long; that I am soon to die and with that in mind I make the following statement:

"I live in a small frame house in Slagtown, Middlesboro, Ky. On the night of Feb. 8, 1924, while I was in bed and a man came in my room and I raised up in bed, he turned my light off and turned on his flashlight, I took it to be Verne Edmonds. He had on a short raincoat, come down to his knees, and a light cap; he come to my house about 11 o'clock that morning and had left about 12 o'clock. He wanted me to take a drink of whiskey but I told him I didn't want any drink; wanted me to sell whiskey for him and I told him I would not. I have given up everything to the Lord and am ready to die. I have prayed all night. When Verne Edmonds left there he said, 'A dark night and bushes could not talk.' The man, before he began to shoot, said: 'Lay down there, God damn you, I will kill all of you.' I raised up to save my children, then he shot me. I realize how he was dressed, then I recognized who it was. I think it was Verne Edmonds. He first shot me in the arm, then he shot me in the breast. I never got out of bed before I was shot. He had been to my house one time

before since he come back from the penitentiary. The shooting took place about the time the 10:10 train come by. It was two or three hours before my wife got any one there. I don't know why Verna Edmonds would shoot me. This Feb. 9, 1924.

"HIRAM HONEYCUTT<br>(By his mark)."

To the reading of this paper the appellant objected; his objection was overruled, and he excepted. He now complains that the introduction of this paper was error because it was not shown that this paper was ever read over to or approved by the deceased. It will be observed that this paper is signed by the deceased, and the presumption would be that it had been read over to him or he knew its contents.

In the case of Saylor v. Com., 97 Ky. 184, the deceased, Hiram Shackelford, had, before his death, made a written declaration concerning a difficulty. That writing was not produced, nor was any evidence offered that it was not in existence, and that it was not in the power of the Commonwealth to produce it. This court reversed the case because the lower court had permitted the Commonwealth to introduce parol evidence of the contents of that writing. In Wharton on Criminal Evidence, section 295, it is said:

"It has been held in England, that if a declaration *in articulo mortis* be taken down in writing and signed by the party making it, the judge will neither receive a copy of the paper in evidence, nor will he receive parol evidence of a declaration which is not itself produced when its production is possible."

In Binns v. State, 46 Ind. 311, the court held that where a written memorandum of dying declaration is made and is signed, then it should be produced or its absence accounted for.

In King v. State, 20 S. W. 169, the Supreme Court of Tennessee said:

"There was no error in the admission of the dying declaration made by the deceased. The evidence clearly shows it was made in the belief that death was certain and impending. It was reduced to writing at his dictation and signed by the deceased."

In the case of Hines v. Commonwealth, 90 Ky. 64, this court has held that where statements were made by the deceased at different times, all may be proved as the dying declarations if all were made under a sense of impending death.

In the case of Turner v. State, 15 S. W. 838, the accused objected to the introduction of a written declaration which was shown to have been signed and sworn to by the deceased at a time when he believed he was *in extremis,* and the court in considering that question said:

"Truth is the object of every investigation in criminal as well as civil cases. The dying statement, being evidence, should be reproduced with the utmost fidelity possible. It is a universal rule that an original writing is always the best evidence. There is no reason why an exception should be made in a criminal case, and that the uncertain report of words from memory should be substituted for the absolutely correct record in writing. The dying declaration has the sanction of an oath, and therefore the added oath can give it no additional verity. Two men swearing to a statement may strengthen it, but one man swearing to it a second time cannot."

It would have been much better if some witness had testified directly that this statement after it was written was read to and approved by Hiram Honeycutt before he signed it, but we find that this exact question has been passed upon in the case of State v. Byrd, reported in 111 Pacific 407. The Supreme Court of Montana passed upon a written declaration made by Erasmus Hetland, the murdered man, which declaration was similar to this in many respects, as it was signed by his mark; there was a witness to his signature and it was sworn to before a justice of the peace. In that case Byrd objected to the introduction of this statement because it was not shown to be in the handwriting of Hetland, and there was no evidence that it was read to him before he signed it or that he assented to it or approved it as correct. In that opinion the Montana court said:

"We understand from the authorities that the courts have always been very careful to first ascertain whether the declaration offered in evidence is in fact the statement of the deceased, and that the rule

contended for by the defendant should extend no further than is necessary in order to place the court in possession of this information. In the case at bar none of those present at the bedside of Hetland were witnesses to his encounter with the defendant. He was the only one present who knew what had taken place. He made an oral statement which was reduced to writing by Dr. Allen, and Hetland thereupon signed the same. Dr. Allen and Mr. Willis both say, 'That is the statement he made.' The statement is brief and not at all complicated. Either of the witnesses might have been allowed, under all the authorities, to give oral testimony as to what was said. We are not inclined to make nice distinctions between a written statement and oral testimony, or between oral evidence that deceased made the specific declarations contained in the paper writing, and the categorical averment, 'This is his statement.' ''

In this case, Mr. R. L. Maddox was introduced as a witness. The evidence shows that Mr. Maddox is a lawyer and notary public, that he was called to the hospital in Middlesboro about 10 o'clock in the morning of Feb. 9; that he found Mr. Honeycutt in a very serious condition; that Mr. Honeycutt told him that he was prepared to die; that he had prayed all night and was ready to die; and that before making this statement Dr. Brummitt had told Mr. Honeycutt that he did not think he had any chance to live. The witness then asked Mr. Honeycutt if he wanted to make any statement, and he says that Mr. Honeycutt started out talking about the matter and the witness took down as best he could what Mr. Honeycutt said.

The appellant complains that the court rejected competent evidence offered by him, to-wit, the evidence of Mary Sneed, a colored woman, who was at the house just a few minutes after the shooting took place. We find that nine pages of the stenographer's transcript is devoted to the evidence of this witness. In her answer to the seventh question, she undertook to contradict the witness, Kate Honeycutt, without the grounds for this contradiction having been laid, and the court very properly sustained the Commonwealth's objection. In her answer to question nine, the court sustained the Commonwealth's objection to the form of the answer. The question was

repeated and she put her answer in a different form, and the court overruled the Commonwealth's objection, permitting the answer to go into the record. The court properly sustained the Commonwealth's objection to her answer to question 24, because she was undertaking to give her own conclusions about a matter. Otherwise she testified at great length, and the court allowed her evidence to take a very wide range.

During the progress of this trial a recess was taken that the court might have time to prepare its instructions, and during the recess, the appellant was remanded to jail. After the recess, the court read to the jury the instructions that had been prepared, and the attorneys for the defense began their argument before it was discovered that the appellant was not in court. The court stopped the proceetings immediately and had the appellant brought into court, then started to reinstruct the jury. The appellant's counsel, in his presence, waived this, and continued with the argument. It is now insisted that by this the appellant was deprived of one of the rights guaranteed him by section 11 of the Constitution. Perhaps the strongest case that can be found in support of his position is that of Kokas v. Com., reported in 194 Ky. 44. In that case a new trial was awarded because the official stenographer had been allowed, after the jury had retired for the consideration of their verdict, to enter the jury room and to read to the jury from the stenographic notes the evidence of certain witnesses, and the stenographer remained in the jury room for perhaps an hour or hour and a half. The court held that this was error, and manifestly it was, for one of the rights of the accused is the right "to meet the witnesses face to face." Counsel for Kokas had consented to this, but the court held that this was a constitutional right which the accused could not waive, nor could his counsel waive it for him.

This case, however, is different. It was not proposed in this case that the appellant waive his right to be present. He was present. Just as soon as the court discovered his absence, he was brought into court, and after he was brought in the court started to reinstruct the jury. Whereupon appellant's counsel waived the reinstructing of the jury. It was his constitutional right to be present. Neither appellant nor his counsel could have waived that, but after he was present in the court either appellant or his counsel did have the right to waive the reading of the

instructions. Thus it will be seen that the right that was waived in the Kokas case, that is the right to be present, was very different from the right that was waived in this case. There are many rights which the accused can waive. See Bonar v. Com., 180 Ky. 338; Doyle v. Com., 18 Ky. L. R. 518; Meece v. Com., 78 Ky. 586; May v. Com., 153 Ky. 141.

Appellant's last contention is that the verdict is not supported by the evidence; but not only did his victim recognize him, but his victim's widow recognized him. They told the officers his name, and described his clothing and his blackened face, and when the officers arrested him they found the clothing described, they found spots upon them that appeared to be blood, and the appellant had not even taken the precaution to wash his face. To us it appears that the proof of his guilt was overwhelming. This was a brutal, cowardly murder. This poor old man was shot while he lay in his bed with the wife of his bosom and the children of his loins. He was not given even a chance to defend himself.

The judgment is affirmed.