W. A. CRITTENDON- *v.* THE STATE.*

(*Jackson.*   April  Term,  1928.)

Opinion filed July 16, 1928.

### 1. CRIMINAL LAW.  HOMICIDE.  SELF-DEFENSE.

Where it appears that the defendant had drawn a hoe, in the act of striking the deceased, when the latter struck the first blow, the defendant would be in no position to rely upon the law of self-defense to excuse the homicide.  (Post, p. 410.)

### 2. CRIMINAL LAW.  EVIDENCE.  IMPEACHMENT OF WITNESS.  CONTRADICTORY STATEMENT.  QUESTION FOR JURY.

An effort is made to impeach a witness by the testimony of other witnesses who state that in conversations with said witness he had said that he looked up and saw the two men fighting and could not tell which struck the first lick.  This is the weakest form of impeachment, and it is a question for the jury to determine whether it was sufficient to authorize a rejection of the testimony.  (Post, p. 411.)

### 3. CRIMINAL LAW.  HOMICIDE.  EVIDENCE.  DYING DECLARATION.

A statement of the deceased offered as a dying declaration is admissible as such when prefaced by the statement of the deceased, "I am going to die and want to tell you how this thing happened," and when supplemented by the testimony of two physicians who testify that the deceased was mortally wounded and knew and realized from the time of the injury that he could not live, notwithstanding the fact that the deceased lived for several days after making the statement.  The finding of the trial court to the effect that under these circumstances the dying declaration was admissible was fully warranted, even though a witness testified that the deceased had told him on the night before he died that he was feeling fine and wanted to go home so that he could advise his boys.  (Post, p. 413.)

4. CRIMINAL LAW. HOMICIDE. EVIDENCE. DYING DEC-
LARATION.

It was not material that the statement repeated in evidence by a
physician as a dying declaration was made before the deceased
was informed that the doctor considered his wound fatal. That
the deceased then entertained the firm conviction that he was
fatally wounded is clearly to be inferred from his own state-
ment to the doctor, and the character and severity of his injury.
(Post, p. 413.)

Citing: Dickason v. State, 139 Tenn., 609.

5. CRIMINAL LAW. HOMICIDE. EVIDENCE. DYING DEC-
LARATION.

It would be a question for the determination of the trial judge
whether the deceased made his statement under the conscious-
ness of impending death, even though his physician had expressed
a belief that he would recover. (Post, p. 415.)

Citing: Lowry v. State, 80 Tenn., 142.

6. CRIMINAL LAW. HOMICIDE. EVIDENCE. DYING DEC-
LARATION.

It is not material that death did not result for a number of days
after the dying declarations were made. "The length of time
which elapsed between the declaration and the death of declar-
ant furnishes no rule for the admission or rejection of the evi-
dence." (Post, p. 415.)

Citing: Lowry v. State, 80 Tenn., 142, 145; Baxter v. State, 83
Tenn., 657; Moore v. State, 96 Tenn., 214.

7. CRIMINAL LAW. HOMICIDE. EVIDENCE. DYING DEC-
LARATION. OBJECTION.

Where there is no dispute or controversy as to the circumstances
under which deceased went to the place where the difficulty oc-
curred, the admission of such statements as a part of the dying
declaration is not error, especially in view of the fact that the
incompetent parts of the dying declaration were not pointed out
or objected to, nor was the trial judge asked to strike out such
parts. (Post, p. 415.)

Citing: Still v. State, 125 Tenn., 94; Dickason v. State, 139 Tenn.,
601-610; Baxter v. State, 83 Tenn., 657.

8. CRIMINAL LAW. HOMICIDE. EVIDENCE. DYING DEC-
   LARATION. CHARGE TO JURY.

The Court charged the jury as follows: "The Court admitted be-
   fore you evidence of certain declarations of the deceased after
   ·he was struck. These declarations are known in law as dying
   declarations. This testimony goes to you, through others, and
   should be received and considered by you as evidence in the case,
   as if Mr. Alexander had given his sworn statement in the form
   of a deposition; that is if you believe the witnesses' statements
   as to what the deceased said. The deceased's statements are
   competent testimony and it is for you to say what credit is due
   his statement as detailed by other witnesses, or as to whether
   or not they are worthy of any credit. As to the declarations of
   the deceased after the difficulty first determine whether or not
   the deceased made the statements detailed by the witnesses, and
   if you believe that he did make the statements testified to by
   the witnesses, then you will next determine what weight and
   credit is due these statements. You are the judge of the weight
   of this testimony." This charge of the court was not error,
   since the jury was clearly instructed that before giving any
   effect to the dying declaration the jury must first determine
   whether the deceased made the statements attributed to him by
   the witnesses; and if the jury should find that the statements
   were made by the deceased as detailed, that the jury was then
   the judge of the weight to be given the testimony, and it was
   within their province to determine what weight and credit was
   due them. (Post, p. 416.)
Citing: Powers v. State, 117 Tenn., 363, 371.

9. CRIMINAL LAW. HOMICIDE. EVIDENCE. DYING DEC-
   LARATION. CHARGE TO JURY.

The trial judge ordinarily instructs the jury to receive a dying dec-
   laration with caution, but the omission of such an instruction
   would, perhaps, not amount to reversible error, in the absence of
   a seasonable request. (Post, p. 417.)
Citing: Dickason v. The State, 139 Tenn., 601.
Distinguishing: Pearson v. State, 143 Tenn., 396.

10. **CRIMINAL LAW. HOMICIDE. EVIDENCE. DYING DECLARATION. CHARGE TO JURY. REQUESTS.**

Where the trial judge instructs the jury that they must first determine whether the declarations were, in fact, made by the deceased, and should then determine what weight should be given to them, in the absence of any peculiar or special circumstances surrounding the making of the declaration by the deceased, and in the absence of a seasonable request for additional instructions, the failure of the court to give further instructions on the weight to be given to the dying declarations would not ordinarily be reversible error. (Post, p. 417.)

11. **CRIMINAL LAW. HOMICIDE. EVIDENCE. DYING DECLARATION. CHARGE TO JURY.**

It is not affirmative error for the trial judge to instruct the jury that a dying declaration should be considered as if the deceased had given his sworn statement in the form of a deposition. This is not equivalent to a statement that the declaration should be admitted as if the deceased had appeared at the trial and had there given his testimony under oath before the jury. (Post, p. 418.)

12. **CRIMINAL LAW. HOMICIDE. EVIDENCE. DYING DECLARATION. CHARGE TO JURY. THEORY.**

An instruction that a dying declaration "should be received and considered by you as evidence in the case as if Mr. Alexander (deceased) had given his sworn statement in the form of a deposition" amounted to no more than that the circumstance under which a dying declaration is made entitled the statement to admission as if made under oath, which is the theory on which a dying declaration is admissible in evidence, since a dying declaration has the sanctity of an oath. (Post, p. 418.)

Citing: Baxter v. State, 83 Tenn., 657, 666; Turner v. State, 89 Tenn., 547-571; Poteete v. State, 68 Tenn., 261, 271; Still v. State, 125 Tenn., 80, 94; Pearson v. State, 139 Tenn., 609; Dickason v. State, 139 Tenn., 369.

13. **CRIMINAL LAW. HOMICIDE. EVIDENCE. DYING DECLARATION. CHARGE TO JURY. SAFEGUARD AGAINST ERROR.**

As a safeguard against the possibility that juries may attach un-
due weight to dying declarations, the court urges strongly that
in every case in which such evidence is offered, the instruction
given in the present case be followed by an additional instruc-
tion to the effect that in weighing such evidence the jury should
bear in mind that the deceased had not appeared in court to give
his testimony as other witnesses, and that when the declaration
was made "the accused was not present, and had neither an
opportunity to make suggestions nor to call attention to the cir-
cumstances in his favor, nor to cross-examine to show inaccu-
racies of memory, or expose bias from passion or prejudice."
(Post, p. 419.)

14. CRIMINAL LAW. HOMICIDE. EVIDENCE. DYING DEC-
LARATION. CHARGE TO JURY. NEWLY-DISCOVERED
EVIDENCE. CUMULATIVE EVIDENCE. NEW TRIAL.

It is not error to refuse a new trial on the ground of newly-dis-
covered evidence when the newly-discovered evidence consists of
testimony of additional witnesses who claimed to have heard a
State's witness say that he did not know which of the parties
struck the first blow. This testimony would have been merely
cumulative, and it is well settled that a new trial will not be
granted when the newly-discovered evidence relates to facts as
to which other evidence was offered on the trial. (Post, p. 420.)

Citing: King v. State, 91 Tenn., 617; Brake v. State, 63 Tenn., 361;
Noel v. McCrory, 47 Tenn., 623; McGavock v. Brown & Williams,
23 Tenn., 251.

---

*Headnotes 1. Criminal Law, 16 C. J., sections 2291, 2293; 2.
Homicide, 30 C. J., section 560; 3. Homicide, 30 C. J., section 493;
4. Homicide, 30 C. J., section 498; 5. ———; 6. Homicide, 30 C. J.,
section 497; 7. Homicide, 30 C. J., section 708; 8. Homicide, 30 C.
J., section 690; 9. Criminal Law, 16 C. J., section 2500; 10. Homicide,
30 C. J., section 521; 11. ———; 12. Criminal Law, 16 C. J., section
2727.

---

FROM WEAKLEY.

---

Appeal from the Circuit Court of Weakley County.—
HON. R. A. ELKINS, Judge.

RICE A. PIERCE and L. E. HOLLADAY, for plaintiff in error.

ROY H. BEELER, Assistant Attorney-General, and R. E. MAIDEN, for defendant in error.

MR. JUSTICE SWIGGART, delivered the opinion of the Court.

The plaintiff in error, W. A. Crittendon, has appealed from a judgment of the Circuit Court of Weakley County, rendered upon a conviction for murder in the second degree, carrying with it a sentence to the penitentiary for an indeterminate term of not less than ten years nor more than twelve years.

In support of an assignment of error that the evidence preponderates against the verdict, the plaintiff in error relies upon the law of self-defense.

The plaintiff in error and the deceased, W. F. Alexander, men of mature years, were first cousins. It appears from the record that Alexander was prosperous in a measure, while Crittendon had suffered financial distress. Crittendon's land, upon which his father had lived before him, was under the weight of two mortgages, upon which interest was in default. Upon the solicitation of a banker, holder of the second mortgage, the equitable title was transferred from Crittendon to Alexander, upon the assumption by the latter of the indebtedness against the land. Some difficulty then arose about possession. There were two tracts, and Alexander wanted to place his two sons on the two tracts, and insisted upon immediate possession as a condition to the transfer. Crittendon gave possession to one tract, but a tenant, whom he had recently placed on the other tract, demanded compensation for moving. The tenant and the Alexanders visited Crittendon about this at night,

calling him out of bed. Crittendon told Alexander that he had acted as if he (Crittendon) had nothing to do with the land, and that they all had "treated him dirty." Plaintiff in error admitted this conversation, and testified that he told Alexander he had "acted a dirty damn rascal." It is very clear that the plaintiff in error considered that he had been treated very harshly by the Alexanders.

After this interview there appears to have been no communication between the plaintiff in error and Alexander, until the day of the homicide, a year later. The ill will appears to have been mutual, and evidence was offered by the plaintiff in error that the deceased had made threats against him, to the effect that he would get rid of him, one way or another. It appears that the deceased had objected to a farmer in the community renting his land to the plaintiff in error.

On the day of the homicide the parties met at a family cemetery, for the purpose of an annual weed cutting. The plaintiff in error came with an uncle, Blake Crittendon, while the deceased came with another uncle, Milton Crittendon. The plaintiff in error and deceased were both nephews of Blake and Milton Crittendon.

The parties to the homicide did not speak to each other, until Blake Crittendon and the plaintiff in error had gone to a nearby house for water, and had returned. According to the undisputed proof, the plaintiff in error then approached the deceased, who was working with his hoe, and asked why he had accused him of operating a still.

The version given by Milton Crittendon is that the deceased made no reply to the plaintiff in error, whereupon the plaintiff in error asked if he was not going to

talk to him. Thereupon the deceased told him to go on and let him alone. The plaintiff in error then said: "You said it and don't deny it," and the deceased again told plaintiff in error to go on and let him alone. Thereupon, according to Milton, the plaintiff in error struck deceased with the hoe with which he had been working, and struck a second blow. At the first blow the deceased was leaning on his own hoe, and after the second blow the deceased struck at the plaintiff in error, who was then making his third blow, so that the hoes clashed. Milton Crittendon testified that the plaintiff in error struck the deceased a fourth blow, after which the deceased fell, and Milton then took hold of the plaintiff in error.

This version of the homicide is in substantial accord with a statement of the deceased, offered in evidence as a dying declaration.

There is little or no conflict between Milton Crittendon and the plaintiff in error, except with reference to the actual striking of the blows. The plaintiff in error admitted that he asked the deceased: "What made you do what you did over at Union City?" and that the deceased made no reply. He testified that he then asked the deceased why he could not talk to him, and that the deceased, in a harsh way, told him to go away and let him alone. He testified that he again asked deceased what made him do what he did, and that deceased, being left-handed, then turned to his left, and struck him the first blow, making a gash over his eye and cheek. The plaintiff in error testified that the deceased struck him twice, and that he himself struck the deceased only two blows.

(1) Blake Crittendon, the other uncle of the two men, testified that the deceased first struck the plaintiff in

error, just after telling plaintiff in error to go on and let him alone; but his testimony is rendered comparatively valueless by the following question and answer:

"Q. 25. At the time he struck Abe was or not Abe Crittendon making an effort to hurt him? A. I don't know whether he was or not, but he hit him pretty quick after he made the first lick."

If the plaintiff in error had drawn his own hoe, in the act of striking the deceased, when the latter struck the first blow, the plaintiff in error would be in no position to rely upon the law of self-defense, to excuse the homicide; and the testimony of Blake Crittendon does not negative the jury's finding that the plaintiff in error was the aggressor.

Blake Crittendon further testified that plaintiff in error struck deceased only two blows, and that the deceased struck the plaintiff in error only one blow.

Blake Crittendon thus corroborates Milton and contradicts the plaintiff in error, as to the number of blows struck by the deceased.

Both the plaintiff in error and Blake Crittendon are contradicted by the testimony of Dr. Chitwood, the physician who first attended the deceased, as to the number of blows struck by the plaintiff in error. Dr. Chitwood testified that, in addition to the principal wound, the deceased had been struck another lick on the back part of his head, and also a lick across his arm. This testimony corroborates Milton Crittendon in his statement that the plaintiff in error struck three or four blows, and contradicts the testimony of the plaintiff in error and Blake Crittendon that only two blows were struck.

(2) No feeling against the plaintiff in error is shown on the part of Milton Crittendon, and his good reputa-

tion was affirmatively proven, without contradiction, by the testimony of six witnesses. An effort at impeachment was made by the testimony of three witnesses that in conversation Milton Crittendon had said that he looked up and saw the two men fighting, and could not tell which struck the first lick.

Impeachment by such method is recognized as the weakest form of impeachment, for obvious reasons, and we think it was a question for the jury to determine, whether Milton Crittendon made this statement, and, if so, whether it was sufficient to authorize a rejection of his testimony.

The State showed cause for ill will on the part of Blake Crittendon toward the deceased, in that the deceased had notified Blake to stay off of his property.

Joe Crittendon, a cousin of the parties, testified that Blake Crittendon told him he did not know who struck the first lick; and the first five questions of the cross-examination of Blake Crittendon, together with the question and answer hereinabove quoted from his examination in chief, clearly indicate an unwillingness on the part of the witness to state very positively that the deceased struck first.

Four witnesses testified that the reputation of the deceased for peace and good order was good.

We are altogether unable to find a preponderance of the evidence against the verdict. The nature of the inquiry begun by the plaintiff in error evinced hostility toward the deceased; while the answer of the deceased manifested an inclination to avoid trouble and a desire to be let alone. Nothing is more irritating or more calculated to arouse anger in a person with a grievance than a refusal of his adversary to talk to him. If the testi-

mony of Milton Crittendon stood alone, it bears inherent evidence of reasonableness and truth, and we could not say that the testimony of the plaintiff in error and of Blake Crittendon constituted a preponderance against it. The issue was largely one of credibility, which the verdict and judgment of the trial court have conclusively determined.

(3) The dying declaration of the deceased was developed in the testimony of four witnesses, Dr. Chitwood, Mrs. Browder, a sister-in-law of the deceased, Mrs. Alexander, the widow, and Knox Alexander, a son of the deceased. The first statement was made to Dr. Chitwood, who repeated it to the jury as a disinterested witness. There is no such difference in the statements repeated by the interested witnesses as to indicate that their testimony was influenced by their natural bias.

Before any of the evidence as to the dying declaration was permitted to go to the jury, the court heard the testimony of the four witnesses, and of others, as to the absence of any hope of recovery on the part of the deceased when the declarations were made.

(4) It appears from this testimony that the deceased was injured on June 2nd, was taken to the hospital at Martin on June 4th, and died on June 18th.

Upon his examination on the afternoon of the difficulty Dr. Chitwood discovered that the deceased had suffered a compound fracture of his skull, with both tables of the skull fractured, a depression of two or two and one-half inches, and a hemorrhage from the artery of the brain. Upon the arrival of Dr. Chitwood, the deceased told him that he had been killed. The statement to Dr. Chitwood was made before the deceased was informed by the Doctor that his condition was hopeless, but after the

statement was made, this information was given to the deceased by the Doctor. An effort was made to take the deceased to the hospital that afternoon, but the deceased refused, on the ground that he preferred to die at home. When he was taken to the hospital, he stated that he consented to go, for the sake of his family, but that it would do no good. On his way to the hospital, he gave directions as to his burial, and for the disposition of his watch and insurance. Upon his arrival at the hospital he told Dr. Brandon to do all he could for him, but said: "It won't do any good." Dr. Brandon testified that the deceased had no hope of recovery at any time, and wanted to go home to die. When he made his statement to his son, Knox, he said: "I am going to die and want to tell you how this thing happened."

The only other evidence as to the condition of the deceased is a statement from a witness, offered by the plaintiff in error, that on the night before Alexander died, he was asked how he felt, and he replied that he was feeling fine, and wanted to go home, so that he could advise his boys. No statement, offered as a dying declaration, was made at that time or subsequently.

We think the evidence abundantly sufficient to authorize and support the finding of the trial judge that the deceased at no time after he was injured entertained any hope of recovery, and that he was at all times conscious of impending death, so that his statements were competent as dying declarations.

It was not material that the statement repeated in evidence by Dr. Chitwood, was made before the deceased was informed that the Doctor considered his wound fatal. That the deceased then entertained the firm conviction that he was fatally wounded is clearly to be inferred from

his own statement to the Doctor, and the character and severity of his injury. *Dickason* v. *State,* 139 Tenn., 609.

(5) It would be a question for the determination of the trial judge whether the deceased made his statement under the consciousness of impending death, even though his physician had expressed a belief that he would recover. *Lowry* v. *State,* 80 Tenn., 142.

(6) It is not material that death did not result for a number of days after the dying declarations were made. "The length of time which elapsed between the declaration and the death of declarant furnishes no rule for the admission or rejection of the evidence." *Lowry* v. *State,* 80 Tenn., 142, 145; *Baxter* v. *State,* 83 Tenn., 657; *Moore* v. *State,* 96 Tenn., 214.

(7) Some of the declarations contain statements of the deceased as to the circumstances under which he went to the place where the difficulty occurred. It is urged that these statements were not confined to the *res gestae,* and that their inclusion rendered the declarations incompetent. *Still* v. *State,* 125 Tenn., 94.

There was no dispute or controversy with reference to such matters, and the admission in evidence of this portion of the dying declaration could not have prejudiced the plaintiff in error. Moreover, this objection cannot be considered as a ground for reversal, for the reason that the incompetent portions of the dying declarations were not pointed out to the trial judge, and objected to; nor was the trial judge asked to strike out and exclude the incompetent portions. *Dickason* v. *State,* 139 Tenn., 601, 610; *Baxter* v. *State,* 83 Tenn., 657.

The trial judge instructed the jury with reference to the dying declarations as follows:

*(8)* "The Court admitted before you evidence of certain declarations of the deceased after he was struck. These declarations are known in law as dying declarations. This testimony goes to you, through others, and should be received and considered by you as evidence in the case, as if Mr. Alexander had given his sworn statement in the form of a deposition; that is if you believe the witnesses' statements as to what the deceased said. The deceased's statements are competent testimony and it is for you to say what credit is due his statement as detailed by other witnesses, or as to whether or not they are worthy of any credit. As to the declarations of the deceased after the difficulty first determine whether or not the deceased made the statements detailed by the witnesses, and if you believe that he did make the statements testified to by the witnesses, then you will next determine what weight and credit is due these statements. You are the judges of the weight of this testimony."

It is assigned as error that the foregoing instruction contains affirmative error, in that the jury were instructed to consider the dying declarations as having the same force and effect as sworn testimony; and it is further assigned as error that the jury were not given further and additional instructions for their guidance in weighing this evidence.

The jury were clearly instructed that before giving any effect to the dying declarations, they must first determine whether the deceased made the statements detailed by the witnesses, and that if they should find that the statements were made by the deceased as detailed, the jury were the judges of the weight to be given the testimony, and they should determine what weight and credit was due them.

In *Powers* v. *State,* 117 Tenn., 363, 371, the jury were instructed that dying declarations of the deceased "have the same weight and sanctity as evidence testified to under oath." This court refused to hold that the failure to amplify the instruction was reversible error, when no request for additional instructions had been made. The court said, however, that in that case there was no question as to the fact that the deceased was fully aware of his impending death, nor as to his good character; and it was held that no injury was done to the accused by the meagerness of the **charge.**

*(9)* In *Dickason* v. *State,* 139 Tenn., 601, this court stated that the trial judge ordinarily instructs the jury to receive a dying declaration with caution, but that the omission of such an instruction would, perhaps, not amount to reversible error, in the absence of a seasonable request. The conviction of Dickason was reversed for affirmative error in the instructions to the jury, in that they were told that the dying declaration was to be given the same consideration as the testimony of a witness offered on the trial.

*(10)* The foregoing holdings in *Powers* v. *State,* and *Dickason* v. *State* appear not to have been given consideration by the court in *Pearson* v. *State,* 143 Tenn., 396. The court there said that attention had not been directed to any case in which the specific question had arisen, whether it was reversible error for the trial judge to fail to instruct the jury "upon the subject of the weight to be given to the dying declaration of the deceased, when admitted in evidence." *Pearson* v. *State* should, therefore, be limited as authority to cases in which the trial judge makes no reference to the subject in his charge, and gives

to the jury no instructions as to their consideration of a dying declaration.

In the present case the trial judge did instruct the jury that they must first determine whether the declarations were, in fact, made by the deceased, and should then determine what weight should be given to them. In the absence of any peculiar or special circumstances surrounding the making of the declaration by the deceased, and in the absence of a seasonable request for additional instructions, we do not think the absence of further or additional instructions should be held to be ground for reversal.

(11) Nor can it be said that it was affirmative error for the trial judge to instruct the jury that a dying declaration should be considered as if the deceased had given his sworn statement in the form of a deposition. This is not equivalent to a statement that the declaration should be considered as if the deceased had appeared at the trial and had there given his testimony before the jury, which, in effect, was the instruction held erroneous in *Dickason* v. *State, supra,* and in *Jackson* v. *State,* 155 Tenn., 371.

(12) The instruction given in this case amounted to no more than that the circumstances under which a dying declaration is made entitled the statement to consideration as if made under oath. This is the theory on which a dying declaration is admissible in evidence. Such an instruction was approved in *Baxter* v. *State,* 83 Tenn., 657, 666, cited in *Dickason* v. *State, supra.* And in *Turner* v. *State,* 89 Tenn., 547, 561, it was held that if the declaration is sworn to by the deceased, the oath gives it no additional verity; the court saying: "The

dying declaration has the sanction of an oath, and there-fore the added oath can give it no additional verity.''

In holding that the instruction above quoted from the charge of the learned trial judge is strictly accurate, and that it was not reversible error to fail to instruct the jury with regard to the natural infirmities of dying declarations as evidence, when no request for such instructions was tendered and when the jury were expressly instructed that they were the judges of the weight to be accorded such evidence, we again emphasize the wise observation of Judge FREEMAN in *Poteete* v. *State,* 68 Tenn. (9 Bax.), 261, 271, quoted with approval by this court in *Still* v. *State,* 125 Tenn., 80, 94, and again in *Pearson* v. *State, supra,* as follows:

''Such testimony is subject to many objections and inherent infirmities. The party is not in condition, frequently, to give calm attention to the question to which he makes his statement. It is usually made in the presence of friends whose feelings are excited against the other party against whom they are to be used, and who may easily direct the dying man's attention to the points in the case bearing most heavily on the guilt of the accused, and who will most naturally leave out of the view all that tend to a different view. The accused is not present, and has neither an opportunity to make suggestions or call attention to the circumstances in his favor, nor to cross-examine to show inaccuracies of memory, or expose bias from passion or prejudice.''

(13) As a safeguard against the possibility that juries may attach undue weight to dying declarations, the court urges strongly that in every case in which such evidence is to be considered by the jury, the instruction given in the present case be followed by an additional in-

struction, that in weighing such evidence the jury should bear in mind that the deceased had not appeared in court to give his testimony as other witnesses, and that when the declaration was made "the accused was not present, and had neither an opportunity to make suggestions nor to call attention to the circumstances in his favor, nor to cross-examine to show inaccuracies of memory, or expose bias from passion or prejudice." Cases may arise in which it would be proper, in the discretion of the trial judge, that the entire quotation from *Poteete* v. *State, supra,* be included in the charge, but the concluding sentence of the quotation is appropriate in every case in which a dying declaration is offered.

(14) Additional assignments of error are made, that a new trial should have been granted because of newly-discovered evidence. The newly-discovered evidence consisted of testimony of additional witnesses who claimed to have heard Milton Crittendon say that he did not know which of the parties struck the first blow. This testimony would have been merely cumulative, and it is well settled that a new trial will not be granted when the newly-discovered evidence relates to facts as to which evidence was offered on the trial. *King* v. *State,* 91 Tenn., 617; *Brake* v. *State,* 63 Tenn., 361; *Noel* v. *McCrory,* 47 Tenn., 623; *McGavock* v. *Brown & Williams,* 23 Tenn., 251.

We find no reversible error on the record, and the judgment of the trial court will be affirmed.